Filed 9/9/20  P. v. Lewis CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>DAIVON LEWIS,<br><br>　　　Defendant and Appellant. | B296286<br><br>(Los Angeles County<br>Super. Ct. No. TA141321) |

　　　APPEAL from a judgment of the Superior Court of Los Angeles County, Patrick Connolly, Judge.  Affirmed as modified.

　　　Marta I. Stanton, under appointment by the Court of Appeal, for Defendant and Appellant Daivon Lewis.

　　　Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr. and Stephanie A. Miyoshi, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Daivon Lewis appeals from the judgment entered after a jury convicted him of crimes arising from his participation in a criminal street gang scheme to extort money from a marijuana dispensary and a recycling center in south Los Angeles.  We affirm as modified.

**FACTUAL AND PROCEDURAL BACKGROUND**

1. *The Third Amended Information*

Lewis was charged in a third amended complaint with two counts of conspiracy to commit extortion (Pen. Code, § 182, subd. (a)(1))[1] (count 1, Eco Recycling; count 9, Kush Kingz); one count of second degree robbery (§ 211) (count 4); one count of assault with an assault weapon (§ 245, subd. (a)(3)) (count 6); one count of assault with a semiautomatic firearm (§ 245, subd. (b)) (count 7); two counts of false imprisonment (§ 236) (counts 10 and 11); two counts of making criminal threats (§ 422) (counts 12 and 13); and one count of extortion (§ 520) (count 17).

The information alleged all offenses had been committed for the benefit of a criminal street gang (§ 186.22, subd. (b)); as to counts 1, 4 and 17, a principal had been armed with a firearm during the commission of the offenses (§ 12022, subd. (a)(1)); and, as to count four, a principal had personally used a firearm (§ 12022.53, subds. (b) & (e)(1)).  It was further alleged Lewis had suffered one prior conviction for a serious or violent felony within the meaning of the three strikes law (§ 667, subds. (b)-(i), 1170.12) and for a serious felony under section 667, subdivision (a), and had served two prior separate prison terms for felonies (§ 667.5, subd. (b)).

---

[1]     Statutory references are to this code unless otherwise stated.

2

2. *Trial Testimony*

The East Coast Crips is a large criminal street gang with approximately 1,000 members in Los Angeles. Its primary activities include vandalism, theft, narcotics sales, weapons possession, burglaries, robberies, assaults with firearms, attempted murder and murder. Lewis, known as "Little Hitman," belonged to the Quetorius 102 subset of the East Coast Crips (Q102's), whose territory ranged at the time of trial from 103rd Street to the south, 99th Street or Century Boulevard to the north, Stanford or McKinley Avenues to the east and Wall or Main Streets to the west. Lewis's younger brother, Justin Glen Smith, was known as "Baby Hitman," and another gang member, Kobe Kincherlow, was known as "Big Sleep." Smith and Kincherlow were tried with Lewis and also convicted of multiple crimes related to the Q102's plan to extort, or "tax,"[2] businesses in south Los Angeles.[3]

a. *The attempted extortion of the marijuana dispensary*

In April 2016 several members of the Q102's, including Lewis, entered into a conspiracy to tax the Kush Kingz Medical Dispensary on South San Pedro Street. Lewis knew the owner and led the other gang members in discussions to tax the

---

[2] According to the People's gang expert, the term "taxing" meant extortion. Gang members require individuals to pay money to conduct business in the neighborhood without interference from the gang. Sometimes, the gang also offers protection in exchange for the money.

[3] Smith and Kincherlow separately appealed their convictions. (See *People v. Smith et al.* (Sept. 9, 2020, B290425) [nonpub. opn.].)

dispensary.[4]  On April 30, 2016 Lewis and Chanel Grant, who testified for the People pursuant to a negotiated plea agreement, asked Martin Rodriguez, a security guard at Kush Kingz, if they could speak to the owner.  Rodriguez told them to come back that night.  They returned at 10:30 p.m. with several other gang members and parked near the entrance of the dispensary.  The owner was not there.  According to Rodriguez, Lewis and another gang member threatened to "shoot up" the business if the owner did not appear.  Rodriguez and Dominique Netterville, another employee, testified they were frightened because the gang members were blocking the dispensary door, as well as Rodriguez's and Netterville's cars, which were parked on the street.  Netterville, who believed Lewis had a gun, pretended to call the owner but instead called the police.  The police arrived, surrounded the building and arrested the gang members.  A videotape from security cameras of the business was played for the jury.  No firearms were recovered from the people found inside the dispensary.

b. *Extortion at the recycling center*

In July 2016 Lewis, Smith, Kincherlow and several of their fellow gang members developed a plan to tax the business next to Eco Recycling on South Main Street.  Grant had seen people moving equipment for growing marijuana into the building.  When Grant knocked on the door and asked what was going on, a man threatened her with a gun and told her to mind her own business.  Grant told Lewis, Smith and Kincherlow about the

---

[4]     The jury heard an audiotaped police interview with Tyrone Dunn, one of the gang members inside the dispensary, who described Lewis's comments about taxing the dispensary.

4

incident, and they accompanied her to the grow house.  The man who had threatened Grant was not there; but the gang members learned the grow house was owned by the brother-in-law of Hector Sanchez, the owner of Eco Recycling.  Sanchez offered to set up a meeting with his brother-in-law.

Sanchez, however, delayed in arranging the meeting with his brother-in-law.  After several days of watching the grow house, Lewis and Kincherlow directly approached the owner, told him an agreement would have to be reached for pulling a gun on Grant and explained the gang intended to tax his business.  Lewis and Kincherlow reported to the other gang members the owner had agreed to pay five pounds of marijuana and $10,000 per month to compensate the gang and to continue to operate in the neighborhood.  Sanchez would handle the agreement on behalf of the owner.

Sanchez again procrastinated, telling Lewis and Kincherlow he did not have the money.  Eventually he provided Kincherlow with some money and marijuana on behalf of the grow house, which was shared among the gang members.  The amount of money and marijuana was less than the amount agreed upon, however, so Kincherlow returned to Eco Recycling.  Sanchez again put him off.  The gang members concluded Sanchez was taking a cut of the amount they were to be paid and decided he would have to pay what was still owed or face retaliation.  Although Grant did not accompany Lewis, Kincherlow and Smith when they again visited Sanchez at Eco Recycling, they told her when they returned that Smith had taken two guns, including an AR-15 assault weapon, from Sanchez.  They did not tell Grant they had taken cash from Sanchez.

When Sanchez testified, he denied any knowledge of a grow house next door. He had been approached in June 2016 by Lewis, Kincherlow, Smith and Grant, who claimed she had been threatened at gunpoint at the business next door. Kincherlow told Sanchez he represented all Crips and, if Sanchez wanted to stay in business, he would have to pay money. Sanchez denied anyone associated with his business had pointed a gun at Grant but agreed to talk to Kincherlow and Lewis the next day. The next day Kincherlow and Lewis demanded $2,000 for the incident with Grant and monthly payments of the same amount to operate the recycling business. After that conversation Sanchez purchased and installed security cameras outside the Eco Recycling office.

Throughout the rest of June Sanchez resisted Kincherlow and Lewis's requests for money by inviting them to smoke and drink with him while claiming he had not received money from his brother-in-law. He testified he was afraid of the gang and used a friendly demeanor to defuse the situation. Sometime in July Kincherlow and Lewis told Sanchez he owed money for June and July, as well as penalties, and demanded he pay $10,000.

On July 27, 2016, after having been rebuffed multiple times, Kincherlow and Lewis entered the Eco Recycling office and demanded money. Sanchez, feeling threatened, did not resist when Lewis took approximately $7,100 from a desk drawer, put it in a bag and left. Half an hour later, Lewis returned, accompanied by Smith and another gang member, James Thompson, and demanded another $3,000. Kincherlow followed a few minutes later. Smith had a pistol, and Thompson had an assault rifle he held down at his side. Smith threatened Sanchez and pointed his pistol at Sanchez's employee, Deandrey Perry.

6

Thompson stood behind Smith, blocking the door.  Smith began opening drawers and took a .40 caliber gun that belonged to Sanchez.  Kincherlow told Smith to calm down and not to take the gun, but Smith refused to give it back.  Kincherlow, Lewis and Thompson left the office, but Smith continued to make threats and told Sanchez he would need to pay $3,100 to get his gun back.  As Smith walked out of the office, he stumbled, turned around and pointed two guns at the office doorway before leaving.  Sanchez believed Smith was waiting to shoot Perry and him if they left the office.

Sanchez closed the recycling center after the incident.  He eventually reported the crime to the police and provided the video surveillance footage, which was played for the jury.  The video showed, when entering the office, Smith had his hands in his pockets as if he was concealing a weapon; and Thompson walked stiffly.  After leaving, Smith withdrew two semiautomatic handguns from his pockets and aimed them at the door; Thompson held an automatic rifle, which he then thrust down his pant leg.

Los Angeles Police Detective Christian Mrakich testified Lewis, Kincherlow, Smith and Thompson had been arrested after being identified in the video by local officers familiar with the Q102's.  Mrakich, who explained his investigation corroborated Grant's testimony, also stated Grant told him she had stolen a stainless steel .44 caliber revolver in a house burglary, which she then sold to Kincherlow.  A stainless steel .44 caliber revolver was later recovered from an unlocked storage shed associated with Kincherlow's apartment.[5]

_____

[5]    The revolver was found in a black backpack along with ammunition, a black ski mask, handcuffs, plastic gloves and a

7

### c. *Lewis's testimony*

Lewis was the only defendant to testify.  Lewis admitted he, Smith and Kincherlow were members of the East Coast Crips Q102's.  According to Lewis, he was a patient at Kush Kingz and had developed a business relationship with the owner, purchasing large amounts of marijuana for resale.  On April 30, 2016 he was turned away from the business when he could not produce his medical certificate.  Rodriguez, the security guard, told him to come later when the owner was expected to be there.  When Lewis returned (with his fellow gang members), Rodriguez told him he had not been able to reach the owner.  While Lewis waited for Rodriguez to call the owner again, the police arrived.  Lewis never threatened anyone and had only intended to buy marijuana.

Addressing the robbery at Eco Recycling, Lewis testified he became involved when Grant told him someone at the grow shop had pulled a gun on her.  Lewis and Kincherlow accompanied her to speak with the owner of the shop.  The owner told them to step around to speak with his business partner (Sanchez) at Eco Recycling.  The grow shop owner explained the situation to Sanchez, who invited Lewis and Kincherlow to come back the next day to discuss amends.  According to Lewis, no threats were made; and the tone of the conversation was civil.  The next day Sanchez told them the security guard who had threatened Grant would be fired and Sanchez and his business partner would sell them marijuana at a cheap price.  Soon after, Sanchez, who was

---

box of condoms.  The same brand of condoms was found in Kincherlow's wallet when he was arrested.  The revolver's serial number matched the serial number of the weapon reported stolen in the burglary described by Grant.

friendly to them, shared samples of the marijuana as they smoked and drank at the Eco Recycling office. Lewis bought marijuana from Sanchez multiple times and sold it to his clients. He arranged to buy a pound of marijuana for Smith and paid Sanchez $1,600 in advance. Lewis and Kincherlow received the marijuana from Sanchez; but, when Smith examined it, he told Lewis the amount was short.

Lewis returned to the Eco Recycling office. Perry was sitting near the door with a gun on his lap. Sanchez had a rifle, and another handgun was on a desk. Lewis told Sanchez the marijuana was short and asked to swap it for another bag sitting on the table. Sanchez refused. Smith then walked in, visibly angry, followed by Thompson (although Lewis did not see either with a weapon). Perry, responding to Smith's aggressive manner, issued a gang challenge and announced he was a member of the Pueblo Bishop Bloods. Sanchez told everyone to "chill" and "be cool" and offered to ask the grow shop owner why the marijuana was short. Kincherlow walked in, and Sanchez told him to get control of his boys. Thompson asked why Perry and Sanchez had weapons and if they were being set up. Sanchez denied it was a setup and said he could not reach the grow shop owner. He offered his M-15 rifle to Thompson to hold as collateral. Lewis left and assumed his fellow gang members left with him.

### 3. *Verdicts and Sentencing*

The jury found Lewis guilty on all counts and found true the special gang and firearm allegations (except for the firearm-use allegation under § 12022.53, subds. (b), (e)(1)). Lewis admitted he had suffered one prior serious felony conviction within the meaning of the three strikes law and section 667, subdivision (a), and had served two prior prison terms. The court

imposed what it described as an aggregate determinate state prison term of 22 years plus four life terms. The sentence consisted of a life term for conspiracy to commit extortion at Eco Recycling (count 1), doubled as a second strike sentence to 14 years to life, plus five years for the prior serious felony conviction; plus a consecutive life term for conspiracy to commit extortion at Kush Kingz (count 9), doubled to 14 years to life; plus a consecutive term of 12 years for assault with a semiautomatic firearm (the middle term of six years, doubled) (count 7), plus five years for the gang enhancement on that count. The court imposed concurrent terms on the remaining counts and imposed and stayed two one-year prior prison term enhancements under section 667.5, subdivision (b). Finally, the court imposed $400 in court operation assessments, $300 in court construction fees and a restitution fine of $5,000.

## CONTENTIONS

Lewis challenges as insufficient the evidence supporting two of his convictions and contends the trial court's decision to replace a juror during deliberations was improper. In addition, he argues certain aspects of his sentence are improper. Finally, Lewis contends the court erred by imposing assessments, fees and fines without first determining his ability to pay, as discussed in this court's decision in *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*).

10

# DISCUSSION

1. *Substantial Evidence Supports Lewis's Conviction for Robbery Under a Natural and Probable Consequences Theory*

The robbery charge was based on Smith's theft of Sanchez's gun. Lewis argues he cannot be culpable for aiding and abetting Smith's crime because he was unarmed and did not participate in taking the gun. Under the prosecutor's theory of the case, however, Lewis was guilty because the robbery was a natural and probable consequence of the conspiracy to extort Eco Recycling. "'"'Each member of the conspiracy is liable for the acts of any of the others in carrying out the *common* purpose, i.e., all acts within the reasonable and probable consequences of the common unlawful design."'"'" (*People v. Maciel* (2013) 57 Cal.4th 482, 515, citations omitted; see *People v. Guillen* (2014) 227 Cal.App.4th 934, 998 ["'each member of a conspiracy is criminally responsible for the acts of fellow conspirators committed in furtherance of, and which follow as a natural and probable consequence of, the conspiracy, even though such acts were not intended by the conspirators as part of their common unlawful design'"].)

Under the natural and probable consequences doctrine, "an aider and abettor is guilty not only of the intended crime, but also 'for any other offense that was a "natural and probable consequence" of the crime aided and abetted.'" (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117.) "'The latter question is not whether the aider and abettor *actually* foresaw the additional crime but whether, judged objectively, it was *reasonably* foreseeable. [Citations.] Liability under the natural and probable consequences doctrine 'is measured by whether a reasonable person in the defendant's position would have or

11

should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted.'" (*People v. Medina* (2009) 46 Cal.4th 913, 920; accord, *People v. Robins* (2020) 44 Cal.App.5th 413, 422.) "'[T]o be reasonably foreseeable "[t]he consequence need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough." [Citations.] A reasonably foreseeable consequence is to be evaluated under all the factual circumstances of the individual case [citation] and is a factual issue to be resolved by the jury." (*Medina,* at p. 920; *Robins*, at p. 422.) We review a jury's finding for substantial evidence.[6]

---

[6] In considering a claim of insufficient evidence in a criminal case, "'we review the whole record to determine whether any rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] "Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]" [Citation.] A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support'" the jury's verdict.'" (*People v. Penunuri* (2018) 5 Cal.5th 126, 142; accord, *People v. Dalton* (2019)

There is little question the jury could find the robbery of the gun was a reasonably foreseeable consequence of the conspiracy to extort Eco Recycling. Kincherlow and Lewis had forced Sanchez to give up more than $7,000 in cash only half an hour before Smith and Thompson entered the office armed and ready to take the additional money the gang members believed Sanchez owed them. Lewis and Kincherlow may have harbored doubts about Smith's aggressive approach and seizure of the gun; but they had led the conspiracy to extort Eco Recycling, meeting repeatedly with the reluctant Sanchez and pushing him to make the payments they demanded.[7]

2. *Substantial Evidence Supports Lewis's Conviction for Assault with an Assault Weapon*

Lewis also contends insufficient evidence supported his conviction for assault with an assault weapon because the evidence failed to establish that Thompson pointed the rifle at Sanchez or Perry or that the weapon was loaded and operational.

To prove a defendant committed assault with an assault weapon pursuant to section 245, subdivision (a)(3), the prosecution must establish the defendant willfully performed an act with such a firearm with the present ability to apply force

---

7 Cal.5th 166, 243-244; *People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

[7] Lewis's citation to cases standing for the limited proposition that a defendant's mere presence at the scene of a crime is insufficient to sustain a conviction (see, e.g., *People v. Miranda* (2011) 192 Cal.App.4th 398, 407) is misleading. The court in *Miranda* affirmed a defendant's conviction for aiding and abetting a robbery on precisely the same grounds as present here. (*Id.* at pp. 408-409.)

with that firearm.  (§§ 240, 245, subd. (a)(3); see *People v. Williams* (2001) 26 Cal.4th 779, 787.)  It is enough for the defendant to have had "only a general criminal intent and not a specific intent to cause injury." (*Williams*, at p. 782; accord, *People v. Chance* (2008) 44 Cal.4th 1164, 1169.)  "[A]ssault only requires an intentional act and actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another."  (*Williams,* at p. 790.)

Certain purposeful acts have long been recognized as assaultive conduct because of their inherent danger to others: "'Holding up a fist in a menacing manner, drawing a sword, or bayonet, presenting a gun at a person who is within its range, have been held to constitute an assault.'"  (*People v. Colantuono* (1994) 7 Cal.4th 206, 219, quoting *People v. McMakin* (1857) 8 Cal. 547, 548; see *People v. Rivera* (2019) 7 Cal.5th 306, 333 [intentional display of a firearm in a menacing manner may be enough to establish assault].)  As *McMakin* explains, "The drawing of a weapon is generally evidence of an intention to use it.  Though the drawing itself is evidence of the intent, yet that evidence may be rebutted when the act is accompanied with a declaration, or circumstances, showing no intention to use it.  But when the party draws the weapon, although he does not directly point it at the other, but holds it in such a position as enables him to use it before the other party could defend himself, at the same time declaring his determination to use it against the other, the jury are fully warranted in finding that such was his intention." (*McMakin*, at p. 549; accord, *People v. Chance*, *supra*, 44 Cal.4th at p. 1172 [assault does not require a direct attempt at violence, "'any indirect preparation towards it . . . such as

14

drawing a sword or bayonet, or even laying one's hand upon his sword, would be sufficient'"]; see *People v. Raviart* (2001) 93 Cal.App.4th 258, 263 ["[a]ssault with a deadly weapon can be committed by pointing a gun at another person [citation], but it is not necessary to actually point the gun directly at the other person to commit the crime"].)

As to the operational capacity of the assault rifle at the time of the offense, the Supreme Court has long allowed fact finders to infer a firearm is operational and loaded from the defendant's conduct. (See *People v. Rodriguez* (1999) 20 Cal.4th 1, 12-13 (*Rodriguez*).) In *Rodriguez* the Supreme Court overturned a court of appeal decision that had reversed an assault conviction for the prosecutor's failure to prove the firearm was loaded. The Supreme Court reminded the appellate court it was obligated to review the record in the light most favorable to the judgment: "'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.'" (*Id.* at p. 11.) The Court declined to address the longtime rule that "an assault is not committed by a person's merely pointing an (unloaded) gun in a threatening manner at another person" (*id.* at p. 11, fn. 3), and instead focused on "the required quantum of circumstantial evidence necessary to demonstrate present ability to inflict injury and thus to sustain a conviction of assault with a firearm" (*ibid.*). In the absence of direct evidence, the Court concluded, "A defendant's own words and conduct in the course of an offense may support a rational fact finder's determination that he used a loaded weapon." (*Id.* at p. 13.) Because the defendant had pointed his gun in the face of the

15

victim and threatened to kill him as he had another victim the preceding day, the Court affirmed the conviction, concluding it could not find the jury had been unreasonable.  (*Ibid.*)

Several courts have chafed at the *Rodriguez* Court's refusal to overrule the requirement of circumstantial evidence a firearm was operational (see, e.g., *People v. Lochtefeld* (2000) 77 Cal.App.4th 533, 542, fn. 10 [calling the rule an "anachronism" and urging the Supreme Court to reexamine it and discard it]; *People v. Miceli* (2002) 104 Cal.App.4th 256, 269 [citing *Lochtefeld*]), but the Supreme Court has declined to do so. (See *People v. Penunuri* (2018) 5 Cal.5th 126, 147 [acknowledging the traditional rule, but following *Rodriguez*:  "[T]he fact that the gun was loaded may be inferred from circumstantial evidence, and we will uphold an assault conviction if the inference is reasonable"].)

In this case the evidence showed that Thompson followed Smith into the Eco Recycling office, walking in a stiff-legged manner, shortly after Lewis and Kincherlow had taken $7,100 from Sanchez.  Thompson withdrew the assault rifle from his pant leg and held it pointing at the floor while blocking the door, preventing Sanchez and Perry from leaving.  Smith, who was also armed, threatened Sanchez and Perry, by stating he and his gang members could just kill them unless they produced additional cash.  Sanchez and Perry each testified he was frightened by the weapons and did not move when Smith opened the drawer and removed Sanchez's gun.  Although there is no testimony Thompson pointed the assault rifle at Sanchez or Perry, there was ample evidence from which the jury could reasonably conclude Thompson was prepared to use the rifle immediately if necessary and it was fully operational.  Under these

16

circumstances we may not second-guess the jury's conclusion Lewis was guilty of assault with an automatic weapon.

      3. *The Trial Court Did Not Abuse Its Discretion by Discharging Juror No. 5*

        a. *The jurors' complaints and the removal of Juror No. 5*

On the second day of deliberations the presiding juror sent a note complaining that Juror No. 5 was allowing past experiences to affect his decisions and did not seem to know the facts presented at trial. The court informed counsel of the note and indicated its intention to question the presiding juror and, possibly, other jurors. The presiding juror, Juror No. 6, advised the court that Juror No. 5 had discussed an experience with a police officer and indicated his belief police officers are not always truthful. Juror No. 6 also stated Juror No. 5 had not paid attention to the evidence, was not familiar with it and appeared confused. When the court explained it was not concerned with whether Juror No. 5 believed or disbelieved witnesses, Juror No. 6 stated Juror No. 5 was not considering the evidence. The court determined no additional inquiry was needed.

The following day, the presiding juror sent a second note: "Multiple jurors have concerns about Juror [No. 5]. We have noticed he is not focused on the case. He has been observed not following the case, falling asleep. He did not know which defendant or attorney is which. He told us he had a son that was an officer but later denied stating it. He also asked if we saw guns on the videos. . . . He does not know what he is voting for."

The court informed counsel it would again speak to the presiding juror, as well as the other jurors who were having concerns about Juror No. 5. The court also noted it had called a recess during closing arguments because Juror No. 5 appeared to be falling asleep.

17

Juror No. 6 told the court Juror No. 3 had written the note. She expressed her own concerns that Juror No. 5 was falling asleep during deliberations and was not paying attention to the videos. He also told irrelevant, rambling stories and had admitted he did not understand what issues jurors were voting on. She added that Juror Nos. 2, 4 and 11 also had issues with Juror No. 5. Juror No. 3, a nurse, repeated the same concerns about Juror No. 5. He was not paying attention, did not know which defendant was which or who the attorneys were: "We may be discussing something and he'll ask us, 'What?' And we have to repeat everything again. I feel like I am personally explaining things to him child-like. And he seems to be falling asleep." She speculated he was suffering from dementia and confirmed he had denied having a son who was a police officer after saying he did.

Juror Nos. 2, 4 and 11 confirmed the views of Juror Nos. 3 and 6, noting their frustration when, after falling asleep, Juror No. 5 would wake up and ask what had happened, forcing them to start over. They also confirmed he did not know who was who, had denied seeing guns in the video and had stated his son was a police officer, only to deny it later. Finally, the court spoke with Juror No. 5. When asked if he had been falling asleep during deliberations, he said, "You know, you fall asleep and you don't know it," but claimed he could still hear what was being said. He denied telling the other jurors his son was a police officer.

The court then heard argument from defense counsel. Kincherlow's attorney argued Juror No. 5 had been deliberating but the other jurors did not like his viewpoint. He, therefore, could not be removed under section 1089. Smith's attorney concurred, pointing out being "slow or forgetful" was not a ground for dismissal and these were simply normal problems in deliberation. The court

18

disagreed and removed Juror No. 5.  The court based its decision on Juror No. 5's inconsistent statements about his son, his admission of sleeping during trial and deliberations and his failure to pay attention and participate in deliberations.

### b. *Governing law*

Section 1089 provides, in part, "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged . . . ."  Lewis challenges the trial court's discharge of Juror No. 5 as improper, asserting other jurors complained about Juror No. 5 because they disagreed with his views, not because he had failed to perform his duty as a juror.

"When a court is informed of allegations which, if proven true, would constitute good cause for a juror's removal, a hearing is *required*." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1051.) "'[A] trial court's inquiry into possible grounds for discharge of a deliberating juror should be as limited in scope as possible, to avoid intruding unnecessarily upon the sanctity of the jury's deliberations.  The inquiry should focus upon the conduct of the jurors, rather than upon the content of the deliberations.  Additionally, the inquiry should cease once the court is satisfied that the juror at issue is participating in deliberations and has not expressed an intention to disregard the court's instructions or otherwise committed misconduct, and that no other proper ground for discharge exists.'" (*Id.* at p. 1054; see also *People v. Nelson* (2016) 1 Cal.5th 513, 569 ["a trial court may intervene in jury deliberations where it receives reports of juror misconduct or

in response to an impasse, but such interventions must be limited and undertaken with the utmost respect for the sanctity of the deliberative process"].)

A trial court's decision to discharge a juror under section 1089 is reviewed for abuse of discretion. (*People v. Armstrong* (2016) 1 Cal.5th 432, 450.) However, in reviewing the record we apply the more stringent "demonstrable reality standard" of review rather than the more deferential substantial evidence standard. (*Armstrong*, at p. 451.) This "'heightened standard . . . more fully reflects an appellate court's obligation to protect a defendant's fundamental rights to due process and to a fair trial by an unbiased jury.'" (*Id.* at p. 450, quoting *People v. Barnwell, supra*, 41 Cal.4th at p. 1052.)

### c. *The court properly removed Juror No. 5*

The record supports the trial court's decision to discharge Juror No. 5. This is not a case like *People v. Bowers* (2001) 87 Cal.App.4th 722, 730 to 731, in which the reviewing court reversed on the ground the isolated accusation of sleeping occurred after the juror in question had made known his disagreement with the view of the evidence shared by the remaining jurors. The court here emphasized to the presiding juror it was not interested in Juror No. 5's perception of witnesses or position on any particular issue; rather, the court limited its inquiry to Juror No. 5's conduct, which included sleeping and failing to track issues discussed in deliberations. In addition, the court did not rely only on the presiding juror; the court also questioned Juror Nos. 2, 3 (the author of the second note), 4 and 11, all of whom confirmed instances of Juror No. 5's falling asleep and his inability to focus or deliberate constructively, as well as his misstatements of fact. While the

20

Supreme Court has not hesitated to reverse when a trial court fails to meet the demanding standard of "demonstrable reality" (see, e.g., *People v. Armstrong*, *supra*, 1 Cal.5th at pp. 451-454 [trial court relied on only two jurors who had stated challenged juror was refusing to deliberate; evidence showed limited instances and failed to account for juror's differing view of evidence]; *People v. Cleveland* (2001) 25 Cal.4th 466, 485-486 [trial court abused its discretion by discharging juror whose view of the evidence differed from that of other jurors; record failed to establish demonstrable reality that juror had refused to deliberate]), it has found ample cause for discharge when a juror is seen sleeping from time to time during deliberations or trial. (See *People v. Williams* (2015) 61 Cal.4th 1244, 1277-1278 [affirming discharge where six jurors described seeing challenged juror sleeping during deliberations]; *People v. Bonilla* (2007) 41 Cal.4th 313, 350 [sleeping during trial constitutes good cause for dismissal of a juror]; *People v. Ramirez* (2006) 39 Cal.4th 398, 456-457 [affirming discharge of juror for sleeping]; *People v. Johnson* (1993) 6 Cal.4th 1, 21-22 [affirming trial court's excusal of juror for sleeping corroborated by "[t]he court, its two deputies, and the prosecutor"].)

    4.   *Lewis's Sentence Requires Correction*

        a.   *The sentence for extortion (count 17) must be stayed pursuant to section 654*

Section 654 "expressly prohibits separate punishment for two crimes based on the same act, but has been interpreted to also preclude multiple punishment for two or more crimes occurring within the same course of conduct pursuant to a single intent." (*People v. Vargas* (2014) 59 Cal.4th 635, 642; accord, *People v. Harrison* (1989) 48 Cal.3d 321, 335.) As applicable here, under

21

section 654 a defendant may not be punished for both the conspiracy to commit a crime and the underlying crime when the conspiracy had no objective apart from the underlying crime. (*People v. Dalton* (2019) 7 Cal.5th 166, 247, citing *People v. Lewis* (2008) 43 Cal.4th 415, 539; *People v. Beman* (2019) 32 Cal.App.5th 442, 446-447; *People v. Vargas* (2001) 91 Cal.App.4th 506, 570-571.)

Lewis was convicted of conspiracy to commit extortion of Eco Recycling (count 1), as well as the underlying crime of extortion (count 17). The overt acts charged in the conspiracy count were identical to the objective of the underlying crime: As the prosecutor argued, "[T]he conspiracy is the plan; the extortion is the actual taking of the money. Here, we have both." The trial court mistakenly ordered the sentence for count 17 (extortion of Eco Recycling) to run concurrently to the sentence on count 9 (the Kush Kingz conspiracy); but, as the Attorney General concedes, the sentence, including any enhancements, should have been stayed under section 654, as arising from the Eco Recycling conspiracy specified in count 1.

> b. *The sentences for counts 10 through 13 should have been stayed pursuant to section 654*

For the same reason, the court erred in directing the sentences on counts 10 through 13 (two counts each of false imprisonment and making criminal threats) to run concurrently with the sentence on count 9. As the Supreme Court has explained, "Whether a defendant may be subjected to multiple punishment under section 654 requires a two-step inquiry, because the statutory reference to an 'act or omission' may include not only a discrete physical act but also a course of conduct encompassing several acts pursued with a single

22

objective.  [Citations.]  We first consider if the different crimes were completed by a 'single physical act.'  [Citation.]  If so, the defendant may not be punished more than once for that act.  Only if we conclude that the case involves more than a single act—i.e., a course of conduct—do we then consider whether that course of conduct reflects a single "'intent and objective'" or multiple intents and objectives."  (*People v. Corpening* (2016) 2 Cal.5th 307, 311.)  ""'If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.'""  (*People v. Capistrano* (2014) 59 Cal.4th 830, 885, quoting *People v. Rodriguez* (2009) 47 Cal.4th 501, 507.)

The Attorney General concedes the crimes specified in counts 10 through 13 were motivated by, and part of, the single intent and objective of extortion at Kush Kingz, already punished by a life sentence (14 years to life) for count 9.  Accordingly, the sentences on those counts must be stayed.

### c.  *The one-year enhancements imposed pursuant to section 667.5, subdivision (b), must be stricken*

Former section 667.5, subdivision (b), in effect at the time of Lewis's sentencing, provided for an enhancement of one year for each prior separate prison term served for "any felony."  Pursuant to this section, the trial court imposed but stayed, two additional one-year enhancements on Lewis (counts 1 and 17).

Effective January 1, 2020, the Legislature amended section 667.5, subdivision (b), to limit the enhancement to prior prison terms served for sexually violent offenses.  (Stats. 2019, ch. 590, § 1.)  The Attorney General concedes this amendment applies retroactively to all cases not yet final.  (See *People v.*

23

*Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 306-308; *In re Estrada* (1965) 63 Cal.2d 740.) Accordingly, because Lewis's prior prison sentences were not for sexually violent offenses, we strike the one-year prior prison enhancements imposed and stayed on the two conspiracy counts.

> 5. *Lewis Has Forfeited His Opportunity To Request an Ability-to-pay Hearing*

In sentencing Lewis the trial court imposed $400 in court operation assessments, $300 in court construction fees and a restitution fine of $5,000. Lewis contends the case should be remanded to allow him the opportunity to demonstrate he is indigent and unable to pay these sums under the decision in *Dueñas*, *supra*, 30 Cal.App.5th 1157. In *Dueñas* this court found it violates due process under both the United States and California Constitutions to impose a court operations assessment as required by Penal Code section 1465.8 or the court facilities assessment mandated by Government Code section 70373, neither of which is intended to be punitive in nature, without first determining the convicted defendant's ability to pay. (*Dueñas*, at p. 1168.)

A restitution fine under section 1202.4, subdivision (b), in contrast, is intended to be, and is recognized as, additional punishment for a crime. Section 1202.4, subdivision (c), provides a defendant's inability to pay may not be considered a compelling and extraordinary reason not to impose the restitution fine; inability to pay may be considered only when increasing the amount of the restitution fine above the minimum required by statute. To avoid the serious constitutional question raised by these provisions, *Dueñas* held, although the trial court is required to impose a restitution fine, the court must stay execution of the

24

fine until it is determined the defendant has the ability to pay it. (*Dueñas*, at p. 1172.)

The Attorney General contends Lewis has forfeited his right to an ability-to-pay hearing. We agree. Although we have repeatedly observed that *Dueñas* announced a constitutional principle that could not have been reasonably anticipated (see, e.g., *People v. Castellano* (2019) 33 Cal.App.5th 485, 489), the *Dueñas* opinion was filed January 8, 2019; and Lewis was not sentenced until February 25, 2019, more than six weeks later. Moreover, even if Lewis's trial counsel was unaware of the *Dueñas* decision at the time of sentencing, Lewis was on notice and had every opportunity to raise an ability-to-pay objection in connection with the $5,000 restitution fine. (See § 1202.4, subds. (c) [court may increase restitution fine beyond $300 statutory minimum], (d) [defendant bears burden of demonstrating his or her inability to pay restitution fine in excess of statutory minimum].) Yet he failed to do so, forfeiting the argument the court erred in imposing it without considering his ability to pay. (See *People v. Miracle* (2018) 6 Cal.5th 318, 356 ["[b]ecause [the] defendant did not object to the [restitution] fine at his sentencing hearing, he has forfeited his challenge"]; *People v. Avila* (2009) 46 Cal.4th 680, 729 ["in not adducing evidence of his inability to pay" a $10,000 restitution fine, the defendant "forfeited the argument"]; *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033 [defendant "forfeited any ability-to-pay argument regarding the restitution fine by failing to object"].)

Lewis's failure to object to the $5,000 restitution fine, a significantly larger amount than the $700 in court operations and court facilities assessments he faced, leaves no doubt he also would not have challenged those assessments even if he had been

aware he had a right under the recently filed *Dueñas* opinion to request a hearing on his ability to pay the assessments. (See *People v. Smith* (2020) 46 Cal.App.5th 375, 395 [defendant forfeited challenge to assessments and fines because he "did not object in the trial court on the grounds that he was unable to pay, even though the trial court ordered him to pay the $10,000 statutory maximum restitution fine"]; *People v. Gutierrez, supra*, 35 Cal.App.5th at p. 1033 ["[a]s a practical matter, if [the defendant] chose not to object to a $10,000 restitution fine based on an inability to pay, he surely would not complain on similar grounds regarding an additional $1,300 in fees"]; but see *People v. Taylor* (2019) 43 Cal.App.5th 390, 400-401 [defendant did not forfeit *Dueñas* challenge to court operations and facilities assessments, even though he did not object to the maximum $10,000 restitution fine, because the "defendant's inability to pay is just one among many factors the court should consider in setting the restitution fine above the minimum"].)

For both these reasons, therefore, Lewis's failure to request a hearing or otherwise raise any question concerning his ability to pay assessments or fines in the trial court forfeits the issue on appeal.[8]

---

[8] Because we do not know why Lewis's trial counsel elected not to request an ability-to-pay hearing, Lewis's argument that failure constituted ineffective assistance of counsel cannot be addressed on direct appeal. (See *People v. Mickel* (2016) 2 Cal.5th 181, 198 ["we have characterized defendant's burden as 'difficult to carry on direct appeal,' as a reviewing court will reverse a conviction based on ineffective assistance of counsel on direct appeal only if there is affirmative evidence that counsel had ""no rational tactical purpose"" for an action or omission"].)

## DISPOSITION

We modify Lewis's sentence (1) to stay the sentences on counts 10 through 13 and 17, including any enhancements; and (2) to strike the one-year sentences imposed under section 667.5, subdivision (b).  As modified, the judgment is affirmed.  The superior court is directed to prepare an amended abstract of judgment and forward it to the Department of Corrections and Rehabilitation.


PERLUSS, P. J.


We concur:


SEGAL, J.


FEUER, J.

27